**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **PETRODOME ENERGY, LLC** § | | |
| § | | |
| *Plaintiff,* § | | |
| § | **CIVIL ACTION NO. 3:19-cv-01217** | |
| v. § | | |
| § | **JURY TRIAL DEMANDED** | |
| **GEMINI INSURANCE COMPANY** § | | |
| § | | |
| *Defendant.* § | | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Petrodome Energy, LLC files this Original Complaint against Defendant Gemini Insurance Company, and in support thereof shows the following:

## PARTIES

1. Plaintiff Petrodome Energy, LLC ("Petrodome") is a Texas corporation with its principal place of business in Houston, Texas. It provides oil and natural gas exploration and development services across oil and gas fields located in Texas, Louisiana, and Mississippi.

2. Defendant Gemini Insurance Company ("Gemini") is a Delaware corporation with its principal place of business in Connecticut. Defendant is authorized to and does conduct insurance business in the State of Texas as a surplus-lines insurer. Defendant Gemini can be served through the Commissioner of Insurance of the Texas Department of Insurance, which is Gemini's agent for service. Pursuant to the insurance policy, Defendant may also be served with process upon the Assistant Vice President – Claims, Berkley Oil & Gas Specialty Services, LLC, 10375 Richmond Ave., Suite 1900, Houston, Texas, 77042.

## JURISDICTION

3. This action is brought pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq*. The amount in controversy in this action exceeds $75,000, exclusive of interest and costs. The parties to this lawsuit also reside in different states and there is complete diversity. Therefore, the Court has subject matter jurisdiction over this action pursuant to 28 U.S.C §§ 1331 and 1332.

4. The Court has personal jurisdiction over Gemini because the insurance contract at issue covers operations in Texas and the coverage dispute and well-control event underlying this complaint occurred in Texas.

## VENUE

5. Venue is proper in the Northern District of Texas, Dallas Division, because Defendant resides there by being subject to the Court's personal jurisdiction. A substantial part of the events giving rise to this claim, including the denial of coverage, occurred in the Northern District of Texas. Defendant has also sued the Well operator, Choice Exploration, Inc., in this District over the same coverage dispute, for an identical policy, involving the same covered loss incident and the same insured gas well. That parallel suit is currently pending before the Court, and involves the same underlying coverage dispute, acts, and omissions. *See Gemini Ins. Co. v. Choice Exploration, Inc.*, No. 3:18-cv-01393-L (currently pending). Venue for this action is therefore proper in the Northern District, Dallas Division.

## FACTS

**The Kent-Spradley #1 Gas Well**

6. On November 1, 2006, Choice Exploration, Inc. ("Choice") acquired a 100% working interest in the Kent Spradley #1 Well (the "Well"), a gas-producing well located on 352 acres in Liberty County, Texas.

7. A working interest is a percentage of ownership in an oil and gas lease granting its owner the right to explore, drill and produce oil and gas from a tract of property. Working interest owners are obligated to pay a corresponding percentage of the cost of leasing, drilling, producing and operating a well or unit. After royalties are paid, the working interest also entitles its owner to share in production revenues with other working interest owners, based on the percentage of working interest owned.

8. Over the next nine years, Choice assigned some of its working interest in the Well to six other entities. Choice remained the operator of the Well, meaning it managed the drilling and production projects on behalf of its own working interest and on behalf of the working interests of the six other entities (nonoperating working interest owners).

9. Plaintiff Petrodome was one of those six nonoperating working interest owners. Effective March 1, 2010, Choice assigned a 40% working interest in the Well to Petrodome via assignment to its wholly owned subsidiary, Petrodome Liberty, LLC. Petrodome later assigned 13.33% of this working interest, via its wholly owned subsidiary Petrodome Liberty, LLC, back to Choice effective January 1, 2012. In 2015, Petrodome's remaining working interest in the Well was 26.67%.

**Gemini Insurance Policy No. JCH2001181**

10. Both Choice and Petrodome procured insurance policies to cover well-control events (or "blowouts"), as well as damage to the Well arising from such events. Choice entered a Joint Operating Agreement with five of the nonoperating working interest owners, whereby it agreed to take out a well-control policy insuring its working interest, and also insuring the working interests of the five nonoperating owners. Defendant Gemini Insurance Company ("Gemini") issued a well-control policy to Choice, covering the policy period April 15, 2015 – April 15, 2016. In all, Choice's insurance policy covered 73.33% of the working interest in the Well during 2015. This figure included coverage for Choice's working interest, plus the working interests of the five nonoperating owners who were parties to the Joint Operating Agreement.

11. Petrodome opted out of insurance coverage through the Joint Operating Agreement. Instead, Petrodome independently procured a well-control policy to cover its 26.67% working interest in the Well for the year 2015.

12. Effective January 1, 2015, Gemini issued Policy No. JCH2001181 to Petrodome (the "Policy"). Petrodome is the Named Assured (or insured) under the Policy. The Policy insured Petrodome's working interest in the Well for Occurrences happening during the policy period (January 1, 2015 – January 1, 2016), as well as for subsequent repairs and plugging costs necessitated by such Occurrences.

13. As of January 1, 2015, Petrodome's working interest in the Well was 26.67%. Petrodome maintained that working interest throughout the 2015-2016 policy period.

14. In addition to the Named Assured, Petrodome's Policy also covers the "subsidiary, associated, affiliated companies or owned and controlled companies, as now or hereafter

constituted, including principals, officers, directors, stockholders and employees of all Named Assureds while acting within the scope of their duties as such and as their interests may appear."

15. The Policy defines "Occurrence" as "one loss, disaster or casualty or series of losses, disasters or casualties arising out of one event."

16. Section IA of the Policy provides up to $15,000,000 in coverage per Occurrence for reimbursement of expenses incurred by the Assured in regaining or attempting to regain control of any insured workover well that becomes out of control during the policy period. The policy limit is subject to a $200,000 Retention (or deductible) to be paid by the Assured.

17. Section IB of the Policy provides coverage for restoration or redrill of a well that has been lost or otherwise damaged from an Occurrence during the policy period. Section IB provides for the reimbursement of expenses incurred by the Assured in restoring or redrilling such a well, up to the per-Occurrence limit of $15,000,000. Section IB also covers reimbursement for expenses to permanently plug and abandon the former well in the event a new well is drilled ("redrill"). Section IB reimburses for the actual amounts incurred had the most prudent and economical methods been employed to restore or redrill the well to return it to pre-loss condition.

18. The Policy also has a plugging and abandonment endorsement. This provision covers any actual expenses incurred to plug and abandon a well, in the event such procedure is required by the governing regulatory authority and the expenses are the sole result of an Occurrence covered under Section 1A. An Assured must pay routine plugging and abandonment costs, and then receives coverage for any amount exceeding these routine costs.

**The September 12-19, 2015 Well Blowout Occurrence**

19. From September 12-19, 2015, the Well sustained a blowout constituting a well-control event under Section 1A of the Policy. The blowout originated with an unintended flow of

gas within the Well's interior, due to pressure differences between zones having different reserve depletions (a "crossflow"). The blowout caused severe damage to the Well's interior. Choice, the operator of the Well, was able to set two plugs deep in the Well's interior to control this unintended gas flow, but the Well has not been returned to operation since. Choice, Petrodome, and the other owners incurred more than $400,000 in expenses to bring the Well back under control.

20. Choice and Petrodome submitted claims for this Occurrence. Gemini has not disputed that this September 12-19 event was a covered Occurrence under Section 1A of the Policy. In fact, Gemini reimbursed Petrodome for $51,378.89 in expenses incurred by Petrodome to bring the Well back under control in September of 2015, signaling its belief that coverage clearly existed for this Occurrence.

21. Choice and Petrodome subsequently investigated the scope of the damage from this well-control event. Investigations revealed extensive damage to the cement interior of the Well caused by the September 12-19, 2015 control event. Investigations also showed that the crossflow was likely still occurring deep within the Well's interior, meaning that attempts to repair the current well through a workover operation would likely result in a second blowout. These estimates, reports, and investigations showed that a workover would fail to address the crossflow issues that precipitated the last well-control event, leaving the Well exposed to subsequent blowouts and the significant danger and expense associated with future blowouts.

**Gemini Denies Coverage for Well Repair Expenses from the Covered Occurrence**

22. Due to the sizable risks of re-entering the Well to repair it, Choice and Petrodome recommended to Gemini that the most prudent and economical method to restore the Well to pre-loss condition was to perform a redrill: drilling a new well, and then plugging and abandoning the current well. Section 1B of the Policy provides coverage for both components of this procedure.

23. In 2017 and 2018, on behalf of Petrodome and other nonoperating owners, Choice submitted to Gemini estimates for two options to repair the Well: (1) a redrill of a new well, using an expandable liner and (2) a workover operation to repair the current Well without redrilling. Due to the risks described above, Choice recommended that a redrill be selected instead of a workover operation. Choice also submitted estimates of costs for permanently plugging and abandoning the current Well, which would have been required if a new well were drilled.

24. On behalf of itself, Petrodome and other nonoperating owners, Choice submitted redrill estimates in the amount of $5,090,000 and a permanent plugging estimate in the amount of $480,000. The redrill estimate included costs for installation of an expandable liner to maintain well integrity, ensuring that the redrill would not fail and cause the owners and insurer to incur additional expenses or to perform additional redrills.

25. Despite recognizing that a covered Occurrence took place in 2015, Gemini has wholly denied coverage of Petrodome's claim, even though the September 12-19, 2015 well control event—covered under Section 1B of the Policy—necessitated repairs to redrill the current Well to restore it to its pre-loss condition.

26. Gemini has refused to cooperate with Petrodome to determine what actual costs and/or expenses Gemini deems prudent and economical, and thus reimbursable, under the Policy. Gemini has stated that it will not confirm coverage and that, instead, Petrodome and the other owners must incur millions of expenses and then submit a reimbursement claim in order to determine whether coverage is accepted or denied. *See Gemini Ins. Co. v. Choice Exploration, Inc.*, No. 3:18-cv-01393-L (N.D. Tex. May 31, 2018).

27. Gemini has further stated that it will not even consider a claim from Petrodome for well-repair expenses until after Gemini has resolved a separate coverage dispute concerning this

Occurrence with the operator Choice, currently pending in this Court as *Gemini Ins. Co. v. Choice Exploration, Inc.*, No. 3:18-cv-01393-L. Gemini has refused to provide any coverage for well-repair expenses to Petrodome while this parallel coverage suit—involving the same Well, same blowout, and same policy—is being adjudicated by the Court.

28.    Based on these unwarranted coverage denials by Gemini, Petrodome, Choice, and the other working interest owners have been unable to proceed with a redrill (or even a workover) of the Well. The Well has remained static and shut-in since September 2015. And because natural gas prices have declined over this four-year period, Petrodome and the other working interest owners have sustained lost profits from the gas reserves that have remained unproduced.

## CLAIM COUNT I: DECLARATORY JUDGMENT

29.    Petrodome incorporates by reference the allegations set forth in paragraphs 1–28 as if fully set forth herein.

30.    The September 12–19, 2015 well control event occurred during the policy period and therefore constitutes a covered Occurrence. Gemini has not disputed that an Occurrence took place. The costs of (a) redrilling using an expandable liner and (b) permanently plugging the lost or otherwise damaged well both arise from damage to the Well sustained during the September 12–19, 2015 Occurrence.

31.    Section IB of the Policy provides reimbursement for actual costs and/or expenses to restore or redrill a well that has been lost or otherwise damaged in an Occurrence.

32.    Because the Well still has a high risk of crossflow, a workover operation, which would require reentry of the current well to repair it—presents significant risk of damage and expense. Therefore, the most prudent and economical method of restoring the Well is to redrill a new well. Redrilling using an expandable liner will prevent future deterioration inside the Well

and will save substantial costs in the long run. Because a redrill using an expandable liner is the most prudent and economical method of repairing the Well, Petrodome has the contractual right, pursuant to Section IB of the Policy, to be reimbursed for actual costs and/or expenses reasonably incurred to redrill the Well using an expandable liner.

33.     In the event of a redrill arising from an Occurrence, Section IB provides for reimbursement for actual costs and/or expenses reasonably incurred to permanently plug and abandon the lost or otherwise damaged former well. A redrill is the most prudent and economical means of repairing the Well damaged by the September 12–19, 2015 Occurrence.  Therefore, the Policy also obligates Gemini to reimburse Petrodome for actual costs and/or expenses Petrodome reasonably incurs to permanently plug and abandon the lost or otherwise damaged Well.

34.     Despite these policy obligations, Gemini has denied coverage for the Occurrence. Gemini's denial has prevented Petrodome, Choice, and the other nonoperating owners from proceeding with the necessary redrilling of the well on behalf of Petrodome and the other working interest owners and has prevented permanent plugging and abandonment of the current Well.

35.     Petrodome has alleged an actual controversy between it and Gemini regarding the rights and obligations under the insurance contract. Petrodome requests a judicial declaration, under 28 U.S.C. § 2201 that the parties have the following rights and obligations under the Policy:

   a.   Petrodome is entitled to coverage under Section IB of the Policy; and

   b.   Gemini is obligated to reimburse Petrodome for actual costs and/or expenses reasonably incurred to perform the following work under Section 1B of the Policy:

      i.    a redrill of the Well, using an expandable liner; and

      ii.   permanent plugging of the current Well, which has been lost or otherwise damaged in the September 2015 Occurrence.

36. This Court may declare the rights and other legal relations of any interested party seeking declaratory judgment, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of final judgment or decree. 28 U.S.C. § 2201(a). Petrodome requests a judicial decree that coverage is available to it under the Policy, for all events and expenses detailed in ⁋ 35 and the preceding paragraphs.

37. In addition, Petrodome is entitled to recover its reasonable and necessary attorneys' fees, court costs, and pre- and post-judgment interest, all as provided by Texas law.

## CLAIM COUNT II: BREACH OF CONTRACT

38. Petrodome incorporates by reference the allegations set forth in paragraphs 1–37 as if fully set forth herein.

39. Petrodome and Gemini were parties to a valid, enforceable insurance contract, embodied in Policy No. JCH2001181, effective during the policy period of January 1, 2015 – January 1, 2016.

40. Petrodome fulfilled its obligations under the insurance agreement, paying Gemini a yearly premium of $113,872.82 for coverage.  Petrodome has substantially performed, tendered performance, or was excused from performance of its obligations under the applicable contract.

41. Gemini anticipatorily breached the insurance contract when it denied coverage to Petrodome following Petrodome's submission of a proof of claim for the September 2015 covered Occurrence.

42. Gemini denied coverage when it refused to cover well-repair expenses necessitated by the Occurrence.

43. Gemini denied coverage when it filed a lawsuit against the Well operator, Choice, in which Gemini disclaimed any coverage obligation. *Gemini Ins. Co. v. Choice Exploration, Inc.*, No. 3:18-cv-01393-L (Doc. 1, ¶ 19).

44. Gemini denied coverage when it stated that it would not make a coverage determination for Petrodome until after it resolved the parallel coverage suit with Choice, as described in ¶ 43.

45. Gemini has also repudiated its contractual obligation to cover well-repair costs incurred by Petrodome by falsely claiming the nonoperating working interest owners no longer have an insurable interest in the Well. *Gemini Ins. Co. v. Choice Exploration, Inc.*, No. 3:18-cv-01393-L (Doc. 39, at 10).

46. Gemini has also repudiated the insurance contract, without just excuse, by taking an unreasonable coverage position that coverage under Section 1B could be denied, after the policy period and after a recognized Occurrence has taken place under Section 1A. There is no basis in the Policy or in law for Gemini's position that coverage under Section 1B can terminate years *after* the policy period expiration, for a covered event happening *during* the policy period.

47. Gemini's breach of the insurance contract has proximately caused damages to Petrodome. Such damages include Petrodome's 26.67% share of the costs of the redrill with expandable liner and permanent plugging of the Well—a figure of approximately $1.6 million.

48. Petrodome is also entitled to additional damages of lost profits due to four years of inactivity of the Well resulting from Gemini's failure to honor its contract. During the four-year period that Gemini has been in breach, the Well has remained static and shut in, denying Petrodome and the other working interest owners valuable profits from the gas reserves. Because natural gas

prices have declined over this four-year period, Petrodome and the other owners have been denied profits that cannot be recovered.

49. In addition, Petrodome is entitled to recover its reasonable and necessary attorneys' fees, court costs, pre- and post-judgment interest, all as provided by Texas law. *See* Tex. Civ.Prac. & Rem. Code § 38.001.

## COUNT III: BAD FAITH

50. Petrodome incorporates by reference the allegations set forth in paragraphs 1–49 as if fully set forth herein.

51. The insurance contract, Policy No. JCH2001181, created a duty of good faith and fair dealing owed by Gemini to Petrodome.

52. Gemini breached its duty of good faith and fair dealing to Petrodome by denying or delaying payment on the Policy for expenses to redrill the Well and permanently plug and abandon the Well.

53. Gemini's liability is reasonably clear because Gemini recognized that the September 2015 blowout was a covered Occurrence under the Policy and has already paid expenses incurred by Petrodome and the other working interest owners to bring the Well back under control immediately following that Occurrence. Gemini has not disputed that the September 2015 blowout was a covered Occurrence under Section 1A of the Policy.

54. The Policy clearly states that an Occurrence covered under Section 1A automatically triggers coverage under Section 1B for any well restoration expenses incurred to restore the well to pre-loss condition. The only requirement for Section 1B coverage is that an Assured sustain a covered loss (Occurrence) under Section 1A.

55. Section 1B of the Policy provides coverage for "expenses reasonably incurred to restore or redrill a Well . . . which has been lost or otherwise damaged as a result of a crater or an Occurrence giving rise to a claim which would be recoverable under Section 1A of this Policy . . . ." Gemini has not disputed that the Well has been damaged from the Occurrence and, as a result, has not been returned to working operation.

56. Because Gemini has already stipulated to a covered Occurrence under Section 1A, it has no reasonable basis for refusing to cover Petrodome's expenses to redrill and otherwise restore the damaged Well under Section 1B.

57. Gemini also has no reasonable basis for contending that Petrodome's coverage has terminated. Petrodome did not lose an interest in the Well during the 2015 policy period. Gemini has not cited any applicable termination provision in the Policy, and has not stated any other Policy reason why it is denying or delaying payment of well-repair expenses to Petrodome.

58. Despite its clear coverage obligation, Gemini has stated that it will not consider reimbursing any expenses submitted by Petrodome until Gemini's parallel coverage lawsuit with Choice has concluded. *See Gemini Ins. Co. v. Choice Exploration, Inc.*, No. 3:18-cv-01393-L.

59. Gemini's breach of its duty of good faith and fair dealing caused Petrodome to sustain damages, in the form of lost policy benefits of coverage for a redrill and plugging and abandonment, and lost profits from four years of the Well's remaining static and unproduced.

## CONDITIONS PRECEDENT

60. All conditions precedent to Petrodome's claims for relief have been performed or have occurred.

## JURY DEMAND

61. Plaintiff hereby demands a trial by jury on any contested issues of material fact. Plaintiff tenders the requisite jury fee to the Clerk of the Court.

## PRAYER FOR RELIEF

Defendant prays for judgment from this Court as follows:

a. a judicial decree that the Policy provides coverage to Petrodome and obligates Gemini to reimburse Petrodome for the redrill with expandable liner and permanent plugging expenses;

b. actual, consequential, expectation, and/or restitution damages of $1.6 million, plus additional damages for lost profits;

c. reasonable and necessary attorneys' fees and costs in this suit for breach of written contract and action for declaratory judgment, pursuant to Tex. Civ. Prac. & Rem. Code §§ 38.001 and 37.009;

d. pre- and post-judgment interest; and

e. all other relief that this Court finds just or equitable.

DATED: May 21, 2019

Respectfully submitted,

s/ *Clint Cowan*
Eric W. Pinker (16016550)
Edward Jason Dennis (24045776)
Clint Cowan (24109760)
Lynn Pinker Cox & Hurst, LLP
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
214-981-3837 – Direct
214-981-3839 – Fax

*Counsel for Plaintiff*